---

STEVEN DIONNE SCOTT,

                Plaintiff,

                                            Case No. 14-cv-864-pp

     v.

JAMES RICHTER, *et al.*,

                Defendants.

---

### DECISION AND ORDER GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NOS. 61, 65), DENYING AS MOOT THE PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 88) AND DISMISSING THE CASE

---

Plaintiff Steven Dionne Scott, a Wisconsin state prisoner who is representing himself, filed an lawsuit under 42 U.S.C §1983, alleging that the defendants violated his civil rights at the Green Bay Correctional Institution ("GBCI"). Dkt. No. 1. The court screened the complaint under 28 U.S.C. §1915, and allowed the plaintiff to proceed with two claims: (1) that James Richter showed deliberate indifference towards the plaintiff's serious eye condition, and (2) that Richard Heidorn and Jeanne Greenwood (formerly Jeanne Zwiers) showed deliberate indifference toward the plaintiff's serious eye condition, severe "nerve and muscle" pain, low back pain, and "scalp pain and hair loss." Dkt. No. 10. The court also exercised supplemental jurisdiction over the plaintiff's state law medical malpractice claim against Richter. Id.

The defendants filed motions for summary judgment on October 6, 2016. Dkt. Nos. 61, 65. The court grants those motions, and dismisses the case.

## I. FACTS[1]

### A. Parties

At the relevant time, the plaintiff was an inmate at GBCI. Dkt. No. 1. Defendant James Richter was an optometrist employed by the Department of Corrections (id. at 5); Richard Heidorn was a full-time physician at GBCI (dkt. no. 85, ¶1); and Jeanne Greenwood was the manager of the Heath Services Unit ("HSU") at GBCI (id., ¶2).

### B. The Plaintiff's Allegations

The facts involve several different medical conditions from which the plaintiff suffered between 2006 and 2012. The court will describe the events in chronological order.

#### 1. The plaintiff's arrival at GBCI

The plaintiff arrived at GBCI in November 2006 with injuries from a work-related accident that occurred in 2005. Dkt. No. 1 at 14, ¶1.[2] He brought

---

[1] The court takes the facts in this section from Defendant Richter's "Amended Proposed Findings of Facts" and from Defendant Heidorn and Greenwood's "Reply to Plaintiff's Response to Defendant Heidorn and Greenwood's Proposed Findings of Fact." Dkt. Nos. 68, 85. Where the plaintiff objects to the proposed findings of fact without citation to evidentiary material, the court deems those facts admitted for the purpose of summary judgment. Civil L. R. 56(b)(2)(B)(i) and (b)(4) (E.D. Wis.). The court takes additional facts from the plaintiff's sworn complaint, dkt. no. 1, which the Seventh Circuit has instructed district courts to construe as an affidavit at the summary judgment stage. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).

[2] The complaint is broken down into counts, and the plaintiff started over with paragraph 1 under each count. The court will refer to the page number of the

all of his medical records with him to GBCI, and these records allegedly showed that he had been diagnosed with an "acute head injury" and "left upper radiculopathy," a disorder of the spinal nerve roots, sometimes called a pinched nerve. Id. at 14-15, ¶¶5, 6. The plaintiff told Heidorn about his 2005 injury, and Heidorn prescribed Ibuprofen 800mg and a muscle relaxer for the pain. Id. at 14, ¶1.

### 2. *The plaintiff's scalp pain and hair loss*

Around October 2008, the plaintiff began noticing hair loss, lumps on his head and extreme dryness in his scalp. Id. at 18, ¶1. He also started experiencing throbbing headaches. Id. The plaintiff alleges that he has Acne Keloidalis Nuche, a condition that causes "extreme/severe scalp pain, discomfort, humiliation, bald spots, loss of sleep, and depression." Id. at 19, ¶4. Between 2008 and 2012, the plaintiff filed over a dozen HSU requests regarding his scalp pain and hair loss. Id. at 18, ¶3.

Most "acne keloids" are treated with antibiotics and special shampoos. Dkt. No. 85 at ¶20. Heidorn considered surgery to remove the plaintiff's keloids, but decided that it was not "necessary based on examination of the risks of surgery (infection and other complications) versus the benefits." Id. Instead, Heidorn prescribed "Tera-Gel shampoo and Selenium Sulfide shampoo" to treat the acne keloids. Id. According to the plaintiff, neither of these shampoos worked. Dkt. No. 1 at 18, ¶2. Nevertheless, Heidorn and Greenwood continued to tell the plaintiff "you must give the shampoo time to

complaint, and the particular paragraph number on that page, without reference to the count number.

start working," id., and that "there was no treatment beyond what Dr. Heidorn was currently giving to him," id. at 19, ¶6.

### 3. *The plaintiff's lower back pain*

The plaintiff alleged that when he arrived at GBCI, he told Heidorn numerous times "about the physical pain he was always dealing with each day." Id. at 14, ¶1. He had x-rays in October 2010 that showed a narrowing of the disc space in his spine; the notes that accompanied those x-rays indicated that a follow-up MRI "should be considered." Id. at 14, ¶2. This appears to have caused low back pain; Heidorn told the plaintiff that this was "just Arthritis." Id. Heidorn does not specifically recall the October 2010 x-rays, but he explains that a "mild" narrowing at L5-S1 would not necessarily require an MRI unless the plaintiff was complaining of nerve pain extending down from the spine to the lower extremities. Dkt. No. 85 at ¶ 19. According to the doctor's notes, the plaintiff did not complain of this symptom; therefore, Heidorn did not request an MRI. Id.

Between January and September 2011, the plaintiff filed at least eleven HSU requests regarding his lower back pain. Dkt. No. 1 at 15, ¶9. He also indicates that he "repeatedly" told Heidorn, Greenwood and nurse Lori Alsum (no longer a defendant) that he "was always in constant pain." Id. Heidorn reviewed the x-rays again on February 18, 2011, and again told the plaintiff, "Nothing was wrong it was only Arthritis." Id. at 14, ¶2. Heidorn "repeatedly" told the plaintiff that "no type of medical treatment was available to him, and that he could not be given any type of medication, that was stronger than what

he was currently receiving." Id. at 16, ¶11. (The plaintiff reports that Heidorn gave him 800 mg. of ibuprofen and a muscle relaxer; he does not say when, and it is not clear if this is what the plaintiff means when he mentions the medication he was "currently receiving." Id. at 14, ¶1.)

The plaintiff asserts that when he arrived at GBCI in November 2006, he'd brought with him "all medical records/reports, pertaining to the February 2005, work accident." Id. at 14. ¶5. He states that "[e]ach visit," he asked about why the HSU "could not obtain the records (medical records)." Id. at 12, ¶5. The plaintiff asserts that he asked for treatment for almost five years, and that "[e]ach time he signed a medical authorization for release forms," but that the HSU was unable to obtain "those records." Id. at 15, ¶7. He explains that on April 6, 2011, he himself contacted ProCare Medical Group, and that they sent him the certified records on April 20, 2011. Id. at ¶8.[3] The plaintiff alleges, however, that "[p]er Dr. Heidorn," Heidorn "could not rely on the medical records that were in his possession." Id. at 12, ¶5.

On April 17, 2011, the plaintiff sent another HSU request about his lower back pain. Id. at 14, ¶3. Registered Nurse Jean Lutsey (not a defendant) examined the plaintiff on April 25, 2011 and reviewed his x-rays. Id. According to the plaintiff, Lutsey explained that "due to the decrease of the spine disc . . . it was pushing down on the sciatic nerve in the lower back," causing the pain. Id. at ¶4. She allegedly stated that Nortriptyline 50mg was "very good for nerve

---

[3] Elsewhere in the complaint, the plaintiff says he sent to ProCare for the records on April 6, 2011. Dkt. No. 1 at 12, ¶5.

pain." Id. The court has no information on whether anyone prescribed this medication to the plaintiff.

The plaintiff alleges that his rheumatologist ordered a follow-up MRI, which revealed "evidence for Chronic Bilateral Sacroiliitis." Dkt. No. 74 at 9. "Sacroiliitis" is an inflammation of the joints where the lower spine and pelvis connect; it can cause pain in the buttocks and lower back. https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-causes/syc-20350747 (last visited January 27, 2018). As evidence, the plaintiff attached an examination report from the Mercy Medical Center's department of radiology dated March 1, 2013, signed by Timothy H. Seline, M.D., which stated, "IMPRESSION: Evidence for chronic bilateral sacroiliitis. Mild active component?" Dkt. No. 74-1 at 2.

4. *The plaintiff's eye care*

In April 2011, the plaintiff began having blurred vision, migraine headaches and sensitivity to light. Dkt. No. 1 at 4, ¶1. At that time, he "was seen for his (2) year follow-up/examination" with Richter (the optometrist) and he told Richter about his eye problems—specifically, that the blurred vision in his left eye had become worse. Id. at 5, ¶3. Richter "only changed prescription." Id. He also told the plaintiff to file an HSU request, because "nothing was wrong except really bad migraine headaches." Id. at ¶2. The plaintiff submitted a request on May 10, 2011. Id.

On June 3, 2011, the plaintiff went to see Richter again about the same problems. Id. at ¶3. Richter conducted "slit lamp" and "dilated" examinations of

the plaintiff's eyes. Dkt. No. 68 at ¶10. Richter placed "numerous eye drops in both eyes to examine the back of the plaintiff's eyes." Dkt. No. 1 at 5, ¶3. Richter observed that "all structures were normal with no signs of inflammation." Dkt. No. 68 at ¶10. The plaintiff disputes Richter's conclusion, asserting that the "slit lamp" and "dilated" examinations revealed "flares and cells," which he characterizes as "a sign of inflammation." Dkt. No. 79 at ¶10.

Richter concluded that "[n]othing" from the June 3, 2011 examinations "suggest[ed] that [the plaintiff's] migraine issues were related to an eye condition." Dkt. No. 68 at ¶15. So he informed the plaintiff that "there was nothing he could do for migraines, because he [was] not a medical doctor." Id. at ¶14. Richter *did* see at that examination, however, that the plaintiff had "light amblyopia" ("lazy eye"), and that the plaintiff "was straining the muscles in his left eye causing the right eye to work harder." Dkt. No. 1 at 6, ¶5; Dkt. No. 68 at ¶18. Amblyopia is a condition where "the vision in one eye is reduced because the eye and the brain are not working properly together." Dkt. No. 68 at ¶19. "Generally, there is no treatment for lazy eye in an adult." Id. at ¶8. Richter suggested that the plaintiff see a medical doctor, and prescribed Excedrin. Dkt. No. 1 at 5, ¶4. The plaintiff alleges that "[n]o other ophthalmologist has ever stated that the Plaintiff, suffers from only light amblyopia," id. at 8, ¶14; the record evidence indicates that in June 2013, Dr. Pamela Dobson diagnosed the plaintiff with amblyopia, dkt. no. 83-1 at 4.

On June 10, 2011, the plaintiff saw Heidorn about his eye issues. Dkt. No. 1 at 5, ¶4. Heidorn was unable to read Richter's handwriting and stated

that he would have to call Richter. Id. The record contains no further information on whether Heidorn contacted Richter, or whether he followed-up with the plaintiff on the matter.

The plaintiff says that he continued to take Excedrin for about two more months. Id. at 6, ¶6. Around that same time, the plaintiff saw Heidorn to discuss his "hypertension care plan." Id. The plaintiff tried to raise his eye issues with Heidorn, but he says that he couldn't because the institution requires a $7.50 co-pay for "unrelated issues at visit," which he couldn't pay. Id.

About a week later, the plaintiff's eye got worse. Id. at ¶7. On August 19 and August 25, 2011, the plaintiff saw several GBCI nurses (none of whom are defendants) regarding the deteriorating condition of his eyes. Id. at ¶¶7-8. They gave him "Ketotifen Ophthalmic Solution." Id. at ¶8. On August 29, 2011, the plaintiff had another follow-up with Heidorn and a non-defendant nurse; Heidorn thought the eye looked clearer, and "inquired, if the Plaintiff was in fact causing damage to his eyes." Id.

Around September 1, 2011, the eye became "exacerbated" again, and the plaintiff was sent to see an outside ophthalmologist, Dr. Memmen (not a defendant). Id. at 7, ¶9. Dr. Memmen conducted "a series of tests, which were the same, exact, and/or similar to the ones done by Dr. Richter." Id. Memmen, however, diagnosed the plaintiff with "anterior uveitis." Id.

Anterior uveitis is "an inflammatory condition of the eye(s) that is most often idiopathic[4] in nature." Dkt. No. 68 at ¶9. At the June 3, 2011 exam, Richter had excluded this diagnosis, concluding that "[h]ad anterior uveitis been present" at that time, "there would have been current signs of inflammation." Id. at ¶12. Richter indicates that because anterior uveitis is "a transient, inflammatory condition, the fact that it was present in September of 2011 does not mean that it was present in June of 2011." Id. at ¶16.

On July 27, 2012, the plaintiff saw a nurse, and complained about burning in his eyes. Dkt. No. 85 at ¶8. The nurse noted that the plaintiff was "continued on 'Prednisone gtts,'" and that he "was told to talk to the physician about 'liquitears,' which [the plaintiff] had requested." Id. The plaintiff saw Heidorn on July 31, 2012, who referred him back to Richter to discuss his eye issues. Id. at ¶9. Richter saw the plaintiff on August 16, 2012; the record contains a note from him on that date, stating "Schedule w/ staff MD., - Rec work up to find or rule out systemic reason for repeated uveitis." Id. at ¶10; dkt. no. 71-1 at 95.

5.    *The plaintiff's severe "nerve and muscle pain"*

On September 30, 2011, GBCI staff placed the plaintiff on "observation status" for self-harm. Dkt. No. 1 at 11, ¶1. The plaintiff asserts that he was in such severe nerve and muscle pain that he wanted to kill himself, "or requested that PSU staff give him anything, so that he could die." Id. The plaintiff states

---

[4] Merriam-Webster defines "idiopathic" as "arising spontaneously or from an obscure or unknown cause," or "peculiar to the individual." https://www.merriam-webster.com/dictionary/idiopathic (last visited January 27, 2018).

that he kept telling Heidorn and the HSU staff that the pain in his "head, neck, and back" felt as if it was getting worse, that the pain made him feel as though "he ha[d] been beaten over his entire body with bats" or as if he "was in a car accident and ha[d] a concussion." Id. at ¶2. The plaintiff says he explained that when he laid down, it felt like he was "spinning around, in a circle making himself dizzy." Id. at ¶3. He explained that his neck was tight, and that it was hard for him to turn his head from side to side, "[o]r bring it up and down to rotate it." Id. He complained that he always had "a numbness and tingling sensation, all over his body," and that it was "difficult to sit, squat, and bring his knees to his chest when doing 'William Exercises.'"[5] Id. He says that he told Heidorn that his feet hurt when he walked for long periods, that his low back hurt so much that it "sen[t] a sharp pain to his testicles," and that the pain woke him up throughout the night, "causing night terrors, seizures, stomach pain, and loss of appetite." Id. at ¶4.

Around January 4, 2012, after GBCI released the plaintiff from observation status, he filed a complaint about his pain. Id. at 12, ¶6. Between January and July 2012, the plaintiff filed over a dozen HSU requests. Id. at ¶8. He sent at least four of the requests directly Greenwood and two of the requests directly to Heidorn. Id. The plaintiff states that Heidorn repeatedly told him that "no type of treatment, was available to him," that the plaintiff couldn't be

[5] "Williams flexion exercises—also called Williams lumbar flexion exercises, Lumbar flexion exercises or simply Williams exercises—are a set or system of related physical exercises intended to enhance lumbar flexion, avoid lumbar extension, and strengthen the abdominal and gluteal musculature in an effort to manage low back pain non-surgically." https://www.physiotherapy-treatment.com/williams-flexion-exercises.html (last visited January 27, 2018).

given any stronger medication, that nothing could be done, and that "no neck and back specialist, was possible because [the plaintiff] was in prison." Id. at 13, ¶9. Heidorn denies making these statements. Dkt. No. 85 at ¶¶14, 18.

### 6. *The plaintiff's allegations of lupus*

Around April 28, 2012, the plaintiff was transferred to the Wisconsin Resource Center (WRC) for mental health treatment. Dkt. No. 1 at 8, ¶16. The plaintiff saw three ophthalmologists; he asserts that it was "deemed necessary" for him to see a rheumatologist for a "uveitis workup." Id. The plaintiff states that he was transferred back to GBCI in June 2012; he alleges that at that time, Heidorn and Greenwood cancelled "the rheumatologist appointment." Dkt. No. 1 at 9, ¶17.

Greenwood responds that she does not remember cancelling any rheumatology appointment for the plaintiff; she indicates that as the health services manager, she wouldn't have had the authority to do so, because "such an appointment could only be cancelled with another physician's order." Dkt. No. 85 at ¶3. Nor does Heidorn recall cancelling a rheumatology appointment, id. at ¶5, and indicates that if the WRC staff actually had scheduled such an appointment, Heidorn would not have cancelled it once the plaintiff returned to GBCI, id. at ¶7.

On August 29, 2012, Heidorn saw the plaintiff regarding "recurring uveitis and other complaints." Id. at ¶11. Heidorn's notes from this visit "acknowledged a positive ANA (antinuclear antibody) test, which is suggestive of lupus." Id. at ¶11. Lupus is a connective tissue disease, "involving the

11

tissues that support the body's organs and other parts of the body." Id. at ¶15. The body reacts to such conditions, which creates "arthritic type pains." Id. Heidorn indicates that if a patient had a lupus diagnosis, "he would request an authorization from the Director of the Bureau of Health Services for a referral to a rheumatologist." Id.

Heidorn noted on August 29, 2012, however, that "more recent labs had been completed with normal results," and that based on those more recent tests, "there was no evidence to link a connective tissue disease such as lupus to [the plaintiff's] recurrent uveitis." Id. at ¶12. Heidorn indicates that during the time Heidorn treated him, the plaintiff did not have a lupus "or other connective tissue disorder diagnosis." Id. at ¶16. Heidorn says that he "did not see a need to refer [the plaintiff] to a rheumatologist because he did not have evidence to present to the Director to suspect a connective tissue disease was the cause of [the plaintiff's] complaints." Id. at ¶17.

The plaintiff asserts that "the entire time," he was "suffering from a systemic inflammatory disease, of the connective tissue—i.e. systemic lupus erythematosus (SLE)." Dkt. No. 1 at 13, ¶10; Dkt. No. 74 at 8 (citing Dkt. No. 71-1 at 1, an undated "Problem List"). He alleges that he "had" this diagnosis "[d]uring the time [he] was treated by Dr. Heidorn," dkt. no. 76 at ¶9, and asserts that "[his] connective tissue disease is so severe [he] routinely go[es] on referral to a rheumatologist," id. at ¶10.

The only evidence in the record relating to the plaintiff's allegation that he has lupus, or a connective tissue disorder, is the undated "Problem List"

attached to Greenwood's declaration as an exhibit. Dkt. No. 71-1 at 1. That document is, as its name would suggest, a list of problems. One of those problems is described as "undifferentiated connective tissue disorder." Id. The document is part of excerpts from the plaintiff's medical records, provided by Greenwood; the records are from both GBCI and WRC. Dkt. No. 71 at ¶6.

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). The movant bears the burden of establishing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must designate specific facts that establish that there is a genuine triable fact. Fed. R. Civ. P. 56(e). The court grants summary judgment when no reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### B.    Eighth Amendment Claims Against Heidorn and Greenwood

#### 1.    *Legal Standard*

"Prison officials violate the Eighth Amendment . . . when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'"

Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997). Deliberate indifference involves both an objective element and a subjective element. Id.

Under the objective element, the plaintiff must show that his medical condition was sufficiently serious. Id. at 1373. A medical condition is sufficiently serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Id. "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011) (quoting Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010)).

Under the subjective element, the plaintiff must show that officials acted with a sufficiently culpable state of mind. See Farmer v. Brennan, 511 U.S. 825, 847 (1994). A prison official must have actual knowledge of the inmate's serious medical condition and either act or fail to act in disregard of that risk. Roe, 631 F.3d at 857. Deliberate indifference "is more than negligence and approaches intentional wrongdoing." Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir. 1998). To that end, a prison official who takes reasonable measures to treat a medical condition is not deliberately indifferent. See Farmer, 511 U.S. at 847.

Establishing deliberate indifference under the subjective prong is a high standard; mere disagreement with a medical professional's medical judgment is insufficient to prevail on a claim. See Estelle v. Gamble, 429 U.S. 97, 106; see

also <u>Arnett v. Webster</u>, 658 F.3d 742, 751 (7th Cir. 2011). A plaintiff must show that a "professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, 'no minimally competent professional would have so responded under those circumstances.'" <u>Arnett,</u> 658 F.3d at 751 (quoting <u>Roe</u>, 631 F.3d at 857).

### 2. *Analysis*

#### a. Defendant Richter

Richter argues that the plaintiff's medical condition was lazy eye, and that this is not a "serious medical condition." Dkt. No. 62 at 14-16. The plaintiff doesn't dispute this assertion. Dkt. No. 77 at 3. Rather, the plaintiff alleges that anterior uveitis is a serious medical condition, <u>id.</u>, and that Richter was deliberately indifferent to that serious medical need when he failed to diagnose or treat it, <u>id.</u> at 3-5.

Richter did not address the plaintiff's contention that anterior uveitis is a serious medical condition. Rather, he argues that even if he failed to diagnose anterior uveitis, that failure did not constitute a violation of the Eighth Amendment. Dkt. No. 62 at 16. Given that the defendant does not claim that anterior uveitis is not a serious medical condition, the court will move on to the parties' arguments about Richter's alleged failure to diagnose that condition.

The plaintiff alleges that Richter intentionally misdiagnosed him with "lazy-eye" to "deny him the proper care and treatment that would have required

a Class III referral to an ophthalmologist." Dkt. No. 77 at 3.[6] As evidence to support his claim, the plaintiff provides his own declaration stating that he complained of migraines at Richter's June 2011 examination, and he states that the "slit lamp" and "dilated" tests Richter conducted at that exam revealed "flares and cells" and "inflammation" in his eyes. The plaintiff also asserts that three ophthalmologists examined him in April 2012; he that none of them diagnosed him with "lazy-eye," implying that had Richter's diagnosis been correct, other doctors would have made similar diagnoses.

The plaintiff has presented no evidence, other than his own assertion, that Richter saw flares, cells or inflammation in his eyes in June 2011. Richter attested that at the June 2011 exam, he conducted "slit lamp" and "dilated" examinations of the plaintiff's eyes and looked for inflammation because the plaintiff had complained of migraines. He explained that the plaintiff's optic nerve would have been inflamed if he had anterior uveitis, but that he saw no inflammation. As a result, Richter concluded that the plaintiff's migraines were not caused by an eye condition. There is no evidence in the record to support the plaintiff's declaration that there was "inflammation" and "flares and cells" in his eyes.

---

[6] The plaintiff makes a statement on the first page of his response brief that "Dr. Ryan Tetting, Optometrist, relied upon the findings that Dr. Richter manufactured and/or falsified so that he did not have to treat the plaintiff, when he did so in fact treat him like a person seeking attention." Dkt. No. 77 at 2. This is the plaintiff's only reference to Richter "manufactur[ing]" or "falsif[ying]" documents, and the plaintiff provides no evidence supporting such a claim. The court will address only the plaintiff's claim that Richter deliberately misdiagnosed him with lazy eye to avoid treating him for anterior uveitis.

There is no dispute that three months after Richter's exam, in September 211, Dr. Memmen diagnosed him with anterior uveitis, dkt. no 71-1 at 25, but there is no evidence to demonstrate that the inflammation was present in June. The plaintiff's argument is based on the assumption that, if he had inflammation in September, he must have had it in June, and that Richter must have seen it and deliberately refused to diagnose it. But as Richter points out, inflammation comes and goes; the fact that the inflammation was present in September does not prove that it was present in June. The plaintiff's allegations that there was inflammation in June, that Richter saw it and deliberately refused to diagnose it have no support in the record.

Nor is there support for the plaintiff's assertion that three other ophthalmologists saw him and did not diagnose his lazy eye. Dr. Pamela Dobson diagnosed the plaintiff with lazy eye in June 2013. ECF No. 83-1 at 4. Of course, the fact that the plaintiff had a lazy eye, and that it caused him eye strain, doesn't mean that he couldn't also have anterior uveitis. But record evidence reflects doubt on the plaintiff's assertion that Richter made up the lazy eye diagnosis. And even if Richter had been wrong about his diagnosis of lazy eye, misdiagnosis of a medical condition, alone, does not show "deliberate indifference." See Williams v. Guzman, 346 F. App'x 102, 106 (7th Cir. 2009).

In short, the record is devoid of evidence that Richter knew, or had reason to know, that the plaintiff had the serious medical condition of anterior uveitis in June 2011, or that he deliberately failed to treat that condition. Richter *did* treat the condition he saw. He prescribed Excedrin for the plaintiff's

pain (which he thought might be related to the eye strain from the lazy eye), and told him to file an HSU request to see a medical doctor about his migraines. Richter later recommended that a medical doctor conduct a "workup" of the plaintiff to determine if the plaintiff's recurring eye problems might be related to a systemic problem elsewhere in his body. Richter acted reasonably to treat the medical conditions that he did see, and that he was qualified to treat. The court will grant summary judgment in favor of Richter on the plaintiff's Eighth Amendment claim against him.

b.    Defendant Heidorn

Heidorn asserts that the court should grant summary judgment in his favor because (a) the record does not support the plaintiff's claim that Heidorn was deliberately indifferent to his eye care, (b) the record does not support the plaintiff's claim that Heidorn told him he couldn't be treated for his nerve, muscle and back pain, and (c) the record does not support the plaintiff's claim that Heidorn ignored the plaintiff's scalp pain. Dkt. No. 66. The court agrees.

i.    **Eye care**

The plaintiff argues that he started having trouble with his eyes in April 2011, and that he was "properly diagnose[d]" with anterior uveitis in September 2011. Dkt. No. 74 at 2. Like Richter, Heidorn does not address the plaintiff's assertion that anterior uveitis was a serious medical condition. The court will treat it as such, and move on to the parties' arguments.

The plaintiff's argument that Heidorn was deliberately indifferent to his anterior uveitis relates to his belief that WRC staff scheduled him to see a

rheumatologist, and that Heidorn played a role in canceling that appointment. The plaintiff appears to assume that, had he gone to the appointment he believes WRC staff scheduled, the rheumatologist would have discovered the anterior uveitis.

In support of his assertion that on May 8, 2012, WRC referred him to a rheumatologist, id., the plaintiff points to a page of his medical records entitled "Prescriber's Orders," attached to Greenwood's declaration, dkt. no. 71-1 at 70. At the bottom of this page appears the note, "05-08-12 rheumatology referral. Send receipt [illegible] appointment." Dkt. No. 71-1 at 70. He also references a set of "Progress Notes," which contain this notation: "05-08-12 Consult Note . . . Recommended for rheumatology workup and ANA was elevated. Will schedule for rheumatology evaluation." Id. at 73.

These two documents support the plaintiff's claim that in May 2012, someone at WRC expressed the opinion that he needed a referral to a rheumatologist. The record is silent, however, regarding whether anyone ever made the referral, or whether an appointment ever was made. There is no evidence that, if anyone made an appointment with a rheumatologist, Heidorn knew about it. The medical records contain the transfer orders from WRC back to GBCI (someone hand-wrote "6-27-12" at the top); they make no mention of a rheumatology appointment, although they detail the plaintiff's medications and treatment orders. Dkt. No. 71-1 at 85-86.

Heidorn also argues that the plaintiff had a doctor to care for his eyes— Dr. Richter, his optometrist. Dkt. No. 66 at 11. He'd also seen Memmen, an

ophthalmologist. Those two doctors would have been the doctors responsible for treating any eye problems the plaintiff might have had, not Heidorn, who was a general physician. Memmen *did* diagnose the plaintiff with inflammation in September 2011; it is not clear how the plaintiff's (unsupported) belief that Heidorn interfered with his seeing a rheumatologist in May 2012 relates to the problems he had with his eyes.

ii. **Nerve, muscle and back pain**

The plaintiff is correct that a "delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." Arnett v. Webster, 658 F.3d 742, 753 (7th Cir. 2011) (citing McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)). The court accept the plaintiff's assertions that he was in severe pain while under Heidorn's care, and will move to the parties' arguments regarding whether Heidorn was deliberately indifferent.

With regard to his muscle and back pain, the plaintiff alleges that when he was placed on observation status in September 2012 for self-harm, he was experiencing pain caused by a lupus flare-up. Dkt. No. 74 at 2-3. He asserts that he repeatedly told Heidorn of his pain, but that Heidorn told him there was no treatment available for it and no stronger medication he could have. He says that had Heidorn properly treated him "for his arthritis pains and scheduled him to see a rheumatologist," Heidorn would have discovered that the pain was due to a lupus flare-up. He also claims that he told Heidorn that two of his family members had lupus, and that one of them had died from the

condition. Id. The plaintiff insists that Heidorn did not run tests for connective tissue disease, and points to the fact that "several months later," he was "diagnosed with a connective tissue disease." Id. at 8.

As noted above, the only evidence in the record relating to the plaintiff having a connective tissue disease is the "Problem List" (apparently from the WRC) contained in his medical records. The records do not contain a diagnosis of lupus, or of any connective tissue disease. Heidorn's uncontroverted testimony is that, while the plaintiff had a single positive ANA test, more recent tests had come back normal, and that Heidorn had no reason to think that a connective tissue disease was what was causing the plaintiff's problems. Again, if the plaintiff did have a connective tissue disease, and Heidorn misdiagnosed it (a conclusion not supported by the record evidence), misdiagnosis of a medical condition, alone, does not show "deliberate indifference." See Guzman, 346 F. App'x at 106.

Further, the plaintiff's own assertions, as well as the evidence in the record, demonstrate that Heidorn did not ignore the plaintiff's pain. At some point after he arrived at GBCI in 2006, the plaintiff told Heidorn that he suffered from pain due to his 2005 work injury. Heidorn prescribed him ibuprofen and a muscle relaxant. It appears that the plaintiff continued this medication while under Heidorn's case. The plaintiff asserts that he asked for stronger pain medication, more scans and other treatments, as well as referral to a specialist, and that Heidorn refused on the basis that the plaintiff was in prison. Heidorn denies these allegations, and "[c]onclusory allegations alone

cannot defeat a motion for summary judgment." Thomas v. Christ Hosp. and Medical Center, 328 F.3d 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

Heidorn saw the plaintiff frequently. He took x-rays. He ordered bloodwork. The plaintiff was not satisfied with Heidorn's efforts. But a plaintiff has no constitutional right to the treatment of his choosing. See Forbes v. Edgar, 112 F.3d 262, 266-67 (7th Cir. 1997) (concluding that the Eighth Amendment does not provide an inmate with the right to "specific treatment"); see also Anderson v. Romero, 72 F.3d 518, 524 (7th Cir. 1995) (concluding that the Eighth Amendment does not require "the most intelligent, progressive, humane, or efficacious" course of treatment). Federal courts give deference to a medical professional's treatment decisions unless "no minimally competent professional would have so responded under those circumstances." See Pyles v. Fahim, 771 F.3d 403, 408-09 (7th Cir. 2014). The plaintiff has not provided evidence that Heidorn's course of treatment for his pain was "blatantly inappropriate" and that no minimally competent professional would have responded as Heidorn did.

The same is true with regard to the plaintiff's back pain. The plaintiff's medical records contain a patient report dated October 28, 2010, from Dr. Amjad Safvi. Dkt. No. 71-1 at 2. This is the report which reflected that the plaintiff had "[m]ild narrowing of the L5-S1 disc space," and said that a [f]ollow up MRI should be considered." Id. The plaintiff directs the court to a radiology report from June 19, 2012 (while the plaintiff was at WRC), indicating that Dr.

Benjamin Huang had done cervical x-rays which showed "[m]ild reverse lordosis at C4-5, otherwise unremarkable cervical spine series." Id. at 79. The report indicated that if the symptoms (pain) persisted, "MRI is recommended for evaluation of disc or non-osseous pathology." Id. The plaintiff also points to the fact that in March 2013, after a referral from his rheumatologist, Dr. Seline commented in his examination report that there was evidence of chronic sacroiliitis, dkt. no. 74 at 9, a condition which can cause low back pain. The plaintiff asserts that, despite these records, Heidorn did not order an MRI for him, and alleges that had Heidorn done so, the plaintiff's pain would have been relieved sooner. Dkt. No. 74 at 9.

While Heidorn indicates that he doesn't remember the October 28, 2010 x-rays that indicated a mild disc narrowing, he indicates that he wouldn't have ordered an MRI for that unless the plaintiff had complained of pain radiating down to his lower extremities. Heidorn indicates that the plaintiff did not complain of that kind of pain, so he did not order an MRI. But the plaintiff says that Heidorn examined the x-rays again in February 2011, given that the plaintiff continued to complain of pain. The plaintiff asserts that in April of 2011, a nurse told him that something was pressing down on his sciatic nerve, and that she told him about a medication that was helpful for such pain. But he doesn't allege that he ever told Heidorn about this medication, or that he asked for it. The radiology report from Dr. Huang in 2012 indicated that the x-rays he took had revealed only a mild condition, and recommended an MRI

only if the symptoms continued. Even the 2013 report from Dr. Seline indicated only that there was "evidence" of sacroiliitis.

Perhaps there was something wrong with the plaintiff's back during the time that Heidorn was treating him. But there is no evidence in the record as to what that "something wrong" was, or that Heidorn knew what that "something wrong" was. There is no evidence that Heidorn ignored the plaintiff's complaints of pain; the record indicates that he attended to those complaints. There is no evidence demonstrating that Heidorn misdiagnosed the plaintiff's pain, and if he had, that alone is not evidence of deliberate indifference. And the plaintiff's belief that there were better, or different, ways for Heidorn to treat him does not prove that Heidorn was deliberately indifferent to his serious medical need.

### iii.    **Scalp pain**

Finally, the defendant is silent as to whether scalp pain from acne keloids constitutes a serious medical condition, but because delaying treatment of non-life-threatening pain can constitute deliberate indifference, the court will address the parties' arguments regarding Heidorn's actions.

The plaintiff asserts that the Tera-Gel shampoo and the Selenium Sulfide shampoo were "not enough to stop the extreme/scalp pain, discomfort, loss of sleep and depression." Dkt. No. 74 at 10. He argues that Heidorn "could have sent the Plaintiff, to a dermatologist to have the keloids frozen as an alternative to having them lazered [sic] off," but that instead, "he chose to let the Plaintiff, suffer for a number of years." Id.

The plaintiff's arguments regarding Heidorn's treatment of his scalp pain truly do amount to a disagreement as to treatment options. The undisputed evidence shows that Heidorn treated the plaintiff's scalp pain by prescribing the two shampoos. The plaintiff does not disagree with Heidorn's conclusion that the risks of surgery outweighed the benefits. Rather, he states that Heidorn "could have" sent him to a dermatologist to have the keloids frozen. The court already has discussed the fact that a plaintiff has no constitutional right to the treatment of his choosing. See Forbes, 112 F.3d at 266-67; Romero, 72 F.3d at 524. The plaintiff has provided no evidence that "no minimally competent professional would have so responded under those circumstances." Pyles, 771 F.3d at 408-09.

For all of these reasons, the court will grant summary judgment in favor of defendant Heidorn.

c.      Defendant Greenwood

Greenwood moves for summary judgment on the ground that she was not personally involved in the alleged denial of the plaintiff's Eighth Amendment rights. Dkt. No. 66 at 8. She argues that if the plaintiff's claims were based on a theory that she was required to intervene in Heidorn's care of the plaintiff, Heidorn was her superior. As to the plaintiff's specific claim that she and Heidorn cancelled the rheumatology appointment he believed the WRC staff had made for him, Greenwood denies this allegation, and argues that it cannot support an Eighth Amendment claim. Id. at 8-9.

The plaintiff responded that because she was the health services manager at GBCI, Greenwood "knew of the inadequate medical treatment that Dr. Heidorn was providing." Dkt. No. 74 at 6. He argues that she could have reviewed his medical file, expressed concerns, and "address[ed] and/or correct[ed] problems and issues created by Dr. Heidorn." Id. He again asserts that Greenwood and Heidorn cancelled the rheumatology appointment he believes the WRC staff made for him. Id.

The plaintiff's assertions amount to a claim that Greenwood failed to intervene with regard to Heidorn's alleged deliberate indifference. "[U]nder certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994) (citations omitted). At least one court has held that in order to prove a failure to intervene with regard to a deliberate indifference claim, "the plaintiff must allege that '[a] constitutional violation has been committed by a [state actor]; and the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring.'" Taylor v. Wexford Health Sources, Inc., Case No. 15 C 5190, 2016 WL 3227310 at *5 (N.D. Ill. June 13, 2016) (italics in original) (citing Piercy v. Whiteside Cnt'y, Ill., Case No. 14 cv 7389, 2016 WL 1719802, at *7 (N.D. Ill. Apr. 29, 2016)). The court has found no evidence that Heidorn was deliberately indifferent to the plaintiff's serious medical needs, so the plaintiff has not proved a constitutional violation that Greenwood could have had an opportunity to intervene to prevent. And the court has found no evidence that Heidorn or Greenwood cancelled an appointment with a

rheumatologist—or even that anyone made such an appointment in the first place.

C.   State Law Medical Malpractice Claim Against Richter

To prevail in a medical malpractice action under Wisconsin Law, the plaintiff must prove that a doctor or other health professional failed to exercise the degree of skill usually exercised by the average practitioner acting in same or similar circumstances. Green v. United States, 530 F. Supp. 633, 642 (E.D.Wis.1982). "Unless the situation is one in which common knowledge affords a basis for finding negligence, medical malpractice cases require expert testimony to establish the standard of care." Wade v. Castillo, 658 F. Supp. 2d 906 (W.D. 2009) (citing Carney-Hayes v. Nw. Wis. Home Care, Inc., 699 N.W.2d 524 (2005)).

Richter asserts that the court should grant summary judgment in his favor on two grounds. First, he points out that the plaintiff has provided no expert testimony about the standard of care exercised by the average practitioner. Dkt. No. 62 at 12. Second, he argues that the plaintiff's malpractice claim is time-barred because no relevant tolling statute applies. Id. at 13-14.

The court need not address the question of whether any tolling statute applies to render the plaintiff's claim timely under the statute of limitations, because the plaintiff has not submitted expert testimony that would demonstrate the applicable standard of care for an average optometrist acting under the same or similar circumstances as Richter. Rather, the plaintiff

submitted two pages of what appears to be a case digest on medical malpractice, dkt. no. 78-1, and four pages of another such digest, dkt. no. 78-2. He appears to have obtained the pages from the Lexis legal research web site. As far as the court can tell, these pages collect cases in which courts have found that someone committed medical malpractice.

These pages do not establish the standard of care applicable to optometrists in Wisconsin; they show only that there are courts who have found that some doctors committed malpractice. Without evidence from an expert to explain the relevant standard of care, the plaintiff cannot demonstrate that Richter's conduct fell below that standard. The court will grant summary judgment in favor of Richter on the plaintiff's malpractice claim.

## III.    CONCLUSION

The court **GRANTS** defendant Richter's motion for summary judgment. Dkt. No. 61.

The court **GRANTS** the motion for summary judgment filed by defendants Heidorn and Greenwood. Dkt. No. 65.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

The court **DENIES AS MOOT** the plaintiff's motion to appoint counsel. Dkt. No. 88.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment.

<u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 29th day of January, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**